1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                   CENTRAL DISTRICT OF CALIFORNIA
10
11
12   LEAH MAXINE QUIROZ,              )   Case No. EDCV 14-1128-KK
13                     Plaintiff,     )
                                      )   MEMORANDUM AND ORDER
14        v.                          )
                                      )
15   CAROLYN W. COLVIN, Acting        )
     Commissioner of Social Security, )
16                                    )
                      Defendant.      )
17   _____)

18        Plaintiff Leah Maxine Quiroz seeks review of the final decision of the
19   Commissioner of the Social Security Administration ("Commissioner" or "Agency")
20   denying her applications for Title II Disability Insurance Benefits ("DIB") and Title XVI
21   Supplemental Security Income ("SSI").  The parties have consented to the jurisdiction of
22   the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  For the
23   reasons stated below, the Commissioner's decision is AFFIRMED.
24   ///
25   ///
26   ///
27   ///
28

                                        1

# I.

## PROCEDURAL BACKGROUND

On March 2, 2011, Plaintiff filed separate applications for DIB and SSI. Administrative Record ("AR") at 195, 203. On August 18, 2011, the Agency denied the applications. Id. at 91, 102. On November 30, 2011, after reconsideration, the Agency affirmed the denial of the applications. Id. at 115, 127.

On January 14, 2012, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Id. at 155. On October 22, 2012, a hearing was held before ALJ Troy Silva. Id. at 52. On October 24, 2012, the ALJ issued a decision denying Plaintiff's applications. Id. at 28.

On November 9, 2012, Plaintiff asked the Agency's Appeals Council to review the ALJ's decision. Id. at 24. On March 6, 2014, the Appeals Council denied Plaintiff's request for review. Id. at 4.

On June 4, 2014, Plaintiff filed the instant action. This matter is before the Court on the parties' motions for summary judgment, which the Court has taken under submission without oral argument. See ECF Nos. 18, 19.

# II.

## RELEVANT FACTUAL BACKGROUND

Plaintiff was born on March 8, 1963, and her alleged disability onset date ("AOD") is March 30, 2009. AR at 91. Plaintiff alleges disability based upon fusion of the lower back, nerve damage in both legs, back injury, and severe depression. Id. Plaintiff was 46 years old at the time of the AOD, and 49 years old at the time of the hearing before the ALJ. Plaintiff graduated from high school, and last worked in March 2009 as a slot attendant at a casino. Id. at 57, 110. Plaintiff previously worked as an activities assistant, prep cook, and cashier. Id. at 110-11.

2

**A.      Treating Sources**

**1.      Dr. S.G. Sharif**

Dr. S.G. Sharif, a family medicine practitioner, treated Plaintiff several times between October 10, 2008, and July 17, 2012.  See id. at 396-407, 462-467, 530-35.  Dr. Sharif treated Plaintiff for various ailments, including back pain, urinary tract problems, and mental health issues.  Id.  Dr. Sharif prescribed various medications to treat Plaintiff's ailments, including Klonopin, Ranitidine, Cymbalta, Oxycodone, Neurontin, Tramdol, Soma, Macrobid, Motrin, and Norco.  Id.

**2.      Dr. Mark Ramirez**

Plaintiff saw Dr. Mark Ramirez, a primary care physician, on May 31, 2012, and June 26, 2012, for a two-part annual physical exam.  See id. at 510-14.  According to Dr. Ramirez's reports, Plaintiff had chronic lumbar pain but her "pain meds decrease her chronic pain from 10 to 3," so Dr. Ramirez recommended Plaintiff "continue them the same."  Id. at 513.  To address Plaintiff's back pain, Dr. Ramirez recommended a "physical therapy referral to assist with helping patient start appropriate exercise regimen."  Id. at 511.  (Dr. Ramirez also diagnosed Plaintiff with morbid obesity.  Id.)

After the first part of the exam, pursuant to Dr. Ramirez's recommendation, Plaintiff increased her intake of Prozac.  Id. at 510.  After the second part of the exam, Dr. Ramirez reported that Plaintiff "believe[d]" her depression was "better."  Id.  Dr. Ramirez also stated he was "able to trim down [Plaintiff's] multitude of [medications] some without adverse effect."  Id. at 511.

**3.      Dr. Edward A. Balbas**

Between September 28, 2010, and September 5, 2012, Plaintiff received treatment approximately nine times at Crown City Rehabilitation Institute ("CCRI").  See id. at 391-95, 515-28, 562-66.  There is no evidence she received treatment at CCRI between October 2010 and June 2011, or between December 2011 and August 2012.  See id.  Dr.

1   Edward A. Balbas signed each of Plaintiff's progress reports from CCRI.  A progress

2   report dated December 15, 2011, stated:  "Range of motion lumbar flexion, was limited

3   to 30 degrees, lumbar extension, was limited to 15 degrees due to pain."  Id. at 516.  On

4   that date and others, Plaintiff received "epidural injections to alleviate her pain."  ECF

5   No. 18 at 12; see also AR at 394, 516-19, 525, 563-66.

6

7       **4.    MFI Counseling Services**

8          From September 14, 2011, to July 30, 2012, Plaintiff received counseling at least

9   twelve times at MFI Counseling Services ("MFI").  AR at 484-92, 538-41.  Plaintiff's

10  counselors generally observed she appeared "tearful," and diagnosed her with

11  "depression, recurrent, severe."  E.g., id. at 492.  At one session, Plaintiff complained to

12  her counselor that her "medical doctor" declined to submit a statement for her SSI

13  application.  Id. at 484.  Plaintiff then asked the counselor to submit a statement for the

14  application.  Id.  The counselor "inform[ed] [Plaintiff] that we usually do not fill out

15  paperwork for SSI."  Id.

16

17      **5.    Teresa Oltmans**

18         Teresa Oltmans was Plaintiff's physical therapist.  Ms. Oltmans performed an

19  initial evaluation on August 14, 2012, and a followup evaluation on September 14, 2012.

20  Id. at 544.  In the followup evaluation, Ms. Oltmans found Plaintiff's back pain

21  symptoms "disrupt" both sitting and standing within 15 to 60 minutes; Plaintiff is

22  moderately impaired at lumbar sidebending and extensions; and Plaintiff is moderately

23  impaired at lumbar flexion, with bending limited to somewhere between 20 to 39

24  degrees.[1]  Id. at 544-45.  Ms. Oltmans also noted Plaintiff's abilities to sit and stand

25  improved between the initial and followup evaluations.  Id.

26

27      _____

28     [1] The ability to bend more than 50 degrees indicates no impairment of lumbar flexion.
    AR at 545.

**B.      Consultative Sources**

      **1.      Consultative Psychiatric Examination**

On June 3, 2011, consultative examiner Dr. Romauldo R. Rodriguez performed a complete psychiatric evaluation of Plaintiff.  After the evaluation, Dr. Rodriguez issued a report.  According to the report:

-      Plaintiff stopped working in March 2009 because of back pain and has not returned to work because of the pain.  Id. at 415.

-      "In the course of dealing with her stressors and her inability to work, [Plaintiff] describes symptoms of depression with sadness, withdrawal, irritability, sleep and appetite disturbances, feeling helpless, useless, and worthless.  At times she feels that her life is not worth living but denies ever feeling suicidal."  Id. at 416.

-      Plaintiff was psychiatrically hospitalized once, when she was 45 years old.  Id.

-      Plaintiff performed various activities of daily living – running errands, driving, cooking – without any apparent assistance.  Id. at 417.

-      During the interview, Plaintiff appeared to be genuine and truthful, and to have good interpersonal skills.  Id.

-      Plaintiff "has been prescribed medication for her symptoms."  However, "she is apparently not being compliant with her medications and has not bothered to have the medications refilled."  Id. at 419.

Dr. Rodriguez concluded Plaintiff suffers from major depressive disorder.  Id. However, he wrote that "as long as the claimant is properly treated for depression and she is compliant with her medications, she could easily recover from her symptoms in the next twelve months."  Id. at 420.


      **2.      Consultative Physical Examinations**

On an unknown date, Plaintiff received a consultative physical examination by Dr.

1  Bryan H. To.  See id. at 422-25.  Dr. To noted that Plaintiff complained of "range of
2  motion" pain in her back.  He found Plaintiff's range of motion "is decreased," with
3  Plaintiff capable of flexion of sixty degrees, extension of ten degrees, and lateral flexion
4  of ten degrees.  Id. at 424.  Dr. To found Plaintiff's back pain did not "elicit true findings
5  of nerve root irritation."  Id.

6        On July 26, 2011, Plaintiff received another consultative examination, this time by
7  Dr. Nizar Salek.  See id. at 426-32.  Dr. Salek noted Plaintiff's "chief complaint" was
8  lower back pain.  Id. at 426.  Dr. Salek found Plaintiff is capable of lateral flexion of at
9  least twenty degrees; extension of between zero and twenty-five degrees; and forward
10  flexion of at least seventy degrees, "with significant pain in the lower back."  Id. at 429.
11  Dr. Salek diagnosed Plaintiff with (1) "[l]ower back pain, status post fusion and
12  laminectomy," (2) depression, and (3) obesity.  Id. at 430-31.

13

14  **C.    Plaintiff's Pre-Hearing Allegations**

15        In a Function Report dated March 26, 2011, Plaintiff claimed that, as a result of
16  her physical and mental conditions, she was unable to clean her home and had difficulty
17  bending "to put shoes or pants on" or "to wash lower parts of body."  Id. at 263.  Plaintiff
18  stated she prepared food once a day.  Id. at 264.  Plaintiff claimed she only goes outside
19  two to three times per month, and does not go out alone.  Id. at 265.  Plaintiff stated that
20  she can "always" pay attention; she follows instructions "very well"; and she "only" has
21  problems getting along with others when she is "going through my depressed moods."
22  Id. at 267.

23

24  **D.    ALJ Hearing**

25        **1.    Plaintiff's Testimony**

26        At the October 22, 2012, hearing before the ALJ, Plaintiff testified she had her
27  first back surgery in 1999 and her second in 2003.  Id. at 57.  She testified that, due to
28  her back pain, she would not be able to sit or stand all day.  Id.  Plaintiff testified she

6

1  used a cane at home, which was not prescribed by a doctor, "so if I get tired of walking,
2  to balance me." Id. at 58.

3       Plaintiff testified she had gone to physical therapy and "finished," but "they
4  wanted me to do some more, . . . because they weren't happy with the relief that I had
5  gotten." Id. at 70.  When asked whether she did "any exercise at home," Plaintiff said
6  she did "what the physical therapy taught me to do" – "just small stuff" like laying on
7  her back and lifting her legs. Id. at 58.  When the ALJ asked Plaintiff to explain a
8  significant gap, from 2010 to 2011, in treatment by Dr. Balbas, Plaintiff was vague but
9  essentially said Dr. Balbas did not give her the "option" of treatment during that time.
10 Id. at 62.

11      Plaintiff testified she was hospitalized twice for depression in the past because she
12 had tried to commit suicide. Id. at 63.  Plaintiff could not recall when those
13 hospitalizations occurred, but said they were "[n]ot recent[]" and occurred before the
14 AOD. Id.

15      Plaintiff testified she has "difficulty bending over." Id. at 68.  She said she dresses
16 herself but is unable to bend over to put on her shoes. Id.  Plaintiff said she bathes
17 herself, drives, babysits her grandchildren occasionally, and goes to church every
18 Sunday. Id. at 68-69.  Plaintiff said she does not do outreach programs with her church
19 because "I'm always in pain, so I stay home a lot." Id. at 68-69.

20

21          **2.    Statements by Plaintiff's Counsel**

22      At the hearing, the ALJ asked Plaintiff's counsel whether she had "anything that
23 shows greater limitations than what . . . is outlined by the [consultative examiners]," such
24 as a "treating source opinion." Id. at 64.  Plaintiff's counsel answered there was no
25 treating source opinion. Id.  Counsel then elaborated: "[W]e definitely tried to get
26 [medical source opinions]. Her doctors just wouldn't fill them out.  Some doctors have
27 policies to that effect." Id. at 65.

28      The ALJ also asked Plaintiff's counsel whether there were "objective studies

showing radiculitis or a basis for . . . radiculitis." Id. at 59.  Counsel answered, "No."
Id.  The ALJ asked Plaintiff's counsel whether there were any treatment records showing
a progression of Plaintiff's symptoms from 2003, the time of Plaintiff's second back
surgery, until the AOD in 2009.  Id.  Counsel answered that there were only "six pages
from 2003," following Plaintiff's surgery.  Id. at 60; see also id. at 346-51.

When the ALJ asked about the gap in Plaintiff's treatment by Dr. Balbas,
Plaintiff's counsel offered a different explanation than Plaintiff did.  Id. at 61.  Whereas
Plaintiff claimed Dr. Balbas did not give her the "option" of treatment during the gap,
Plaintiff's counsel stated:  "It looked to me from the record like there was a lot of mental
health issues going on [during the gap] and not necessarily in the physical realm."  Id.;
see also id. at 62 ("It looks like . . . the treatment kind of shifted to a mental health
perspective and then we're back re-establishing care with [Dr. Balbas].").

### 3.    Vocational Expert's Testimony

The ALJ presented various descriptions of hypothetical individuals to a vocational
expert ("VE"), and asked the expert what jobs such an individual would be able to
perform.  The first hypothetical individual was "a younger individual with a high school
education" who could not "climb ladders, ropes or scaffolds," but who was able to "lift
and/or carry 20 pounds occasionally and ten pounds frequently"; to "bend, kneel, stoop,
crouch and crawl on an occasional basis"; and to "occasionally climb ramps and stairs."
Id. at 83.  The ALJ asked the VE whether such an individual would "be able to do any of
the claimant's past work."  Id.  The VE answered that such an individual would be able
to work as a slot attendant and cashier as those positions are described in the Dictionary
of Occupational Titles ("DOT").  Id.

The second hypothetical individual was the same as the first hypothetical
individual, but was "limited to simple, repetitive tasks."  Id. at 84.  The ALJ asked the
VE whether such an individual could "do any of the claimant's past work."  Id.  The VE
answered, "The slot attendant position."  Id.

The third hypothetical individual was the same as the first hypothetical individual, "except this individual would be able to lift and/or carry up to ten pounds only." Id. The ALJ asked the VE whether such an individual could "do any of the claimant's past work." Id. The VE answered no, but added that such an individual would be able to perform sedentary unskilled work, such as a mail-sorting or ticket-checking position. Id. at 84-85.

The fourth hypothetical individual was the same as the third hypothetical individual, "except this individual would be limited to simple, repetitive tasks." Id. at 85. The ALJ asked the VE whether such an individual would be able to perform the same jobs as the third hypothetical individual. Id. The VE answered yes. Id.

The fifth hypothetical individual was the same as the first hypothetical individual, "except this individual would require a sit/stand option." Id. at 85. The ALJ asked the VE whether such an individual would "be able to do any of the claimant's past work." Id. The VE answered no, but offered examples of other "unskilled positions with a sit/stand option" that the hypothetical individual could do. Id. at 85-86.

The sixth (and last) hypothetical individual described by the ALJ was "an individual with any of the limitations I've already described, except you would have an individual who is going to miss work occasionally due to depression, . . . meaning up to one-third of the time." Id. at 86. The ALJ asked the VE whether there would "be work for that individual." Id. The VE answered, "There would not be any work." Id.

After the ALJ finished examining the VE, Plaintiff's counsel presented descriptions of additional hypothetical individuals to the VE, and asked whether those individuals would be able to work. As a seventh hypothetical individual, Plaintiff's counsel asked the VE to consider "the individual described in hypothetical number four," but with the "additional limitations of occasional push/pull with the [bilateral] lower extremities" and "frequent reaching in all directions bilaterally and frequent fine and gross manipulation bilaterally." Id. at 87. The VE said the seventh hypothetical individual would not be able to do the same jobs as the fourth hypothetical individual,

9

1  but would be able to be a "call out operator" or "surveillance system monitor." Id. at 87-

2  88.

3       Plaintiff's counsel then described an eighth hypothetical individual, who was the

4  same as the seventh but who "should not be responsible for the safety of others [or do

5  any] jobs that would require any hyper vigilance." Id. at 88.  The VE said the eighth

6  hypothetical individual could still be a call out operator, but could not be a surveillance

7  system monitor.  Id.

8       Plaintiff's counsel then described a ninth hypothetical individual, who was the

9  same as the eighth but who required "a sit/stand option." Id. at 89.  The VE said there

10  would be no jobs for such an individual.  Id.  Plaintiff's counsel then said, "That's all I

11  have," and made a brief closing argument.  Id.

12

13                                    **III.**

14                **STANDARD FOR EVALUATING DISABILITY**

15       In order to qualify for DIB or SSI, a claimant must demonstrate a medically

16  determinable physical or mental impairment that (1) prevents her from engaging in

17  substantial gainful activity and (2) is expected to result in death or to last for a

18  continuous period of at least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th

19  Cir. 1998).  The impairment must render the claimant incapable of performing the work

20  she previously performed and incapable of performing any other substantial gainful

21  employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098

22  (9th Cir. 1999).

23       To decide if a claimant is disabled, and therefore entitled to benefits, an ALJ

24  conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are:

25       (1)   Is the claimant presently engaged in substantial gainful activity?  If so, the

26             claimant is found not disabled.  If not, proceed to step two.

27       (2)   Is the claimant's impairment severe?  If not, the claimant is found not

28             disabled.  If so, proceed to step three.

                                      10

(3)    Does the claimant's impairment meet or equal one of the specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.[2]

(4)    Is the claimant capable of performing work she has done in the past?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)    Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets her burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience.  Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

///
///
///
///

---

[2] "Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's [residual functional capacity]."  Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1222-23 (9th Cir. 2009) (citing 20 C.F.R. § 416.920(e)).  In determining a claimant's residual functional capacity, an ALJ must consider all relevant evidence in the record.  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).  This involves, inter alia, evaluating the credibility of a claimant's testimony regarding his capabilities.  Chaudhry v. Astrue, 688 F.3d 661, 670 (9th Cir. 2012).

# IV.

## THE ALJ'S DECISION

**A.    Step One**

At step one, the ALJ found Plaintiff "has not engaged in substantial gainful activity since March 30, 2009, the alleged onset date" of disability.  AR at 33 (citations omitted).

**B.    Step Two**

At step two, the ALJ found Plaintiff "has the following severe impairments:  status post lumbar diskectomy and fusion with residual pain and limitation of range of motion." Id. (citations omitted).  The ALJ found the following impairments of Plaintiff's non-severe:  gastroesophageal reflux disease (GERD), obesity, and depression.  Id. at 33-34.

**C.    Step Three**

The ALJ found Plaintiff did not have an impairment that meets or equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id. at 36.

**D.    RFC Determination**

The ALJ found Plaintiff "has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except she can lift and/or carry 20 pounds occasionally and 10 pounds frequently; she can occasionally bend, kneel, stoop, crouch, and crawl; she can occasionally climb ramps and stairs; and she cannot climb ladders, ropes, or scaffolds."  Id.  As part of the RFC assessment, the ALJ found that Plaintiff's "subjective complaints are less than fully credible and the objective medical evidence does not support the alleged severity of symptoms."  Id. at 41.  The ALJ's analysis in support of this credibility determination spans approximately five pages.  See id. at 37-41.

One reason the ALJ found Plaintiff's claim of total disability not fully credible

12

1   was her description of personal activities, which included doing chores, cooking, going

2   to church weekly, and babysitting occasionally.  Id. at 37.  The ALJ found that "the

3   claimant's description of her daily activities is not inconsistent with the residual

4   functional capacity for a range of light work activities that I have assessed."  Id. at 37.

5          Another reason the ALJ found Plaintiff's disability claim not fully credible was

6   the absence of evidence that Plaintiff's back condition worsened between 2003, when

7   she had her second back surgery, and the AOD of March 2009.  The ALJ noted Plaintiff

8   returned to work after both of her back surgeries and "continued to work until March

9   2009 until she allegedly quit because she could no longer do the work because of [her]

10  back pain."  Id.  The ALJ stated:  "However, the claimant's allegedly disabling back pain

11  was present at approximately the same level of severity prior to the alleged onset date

12  and there is no evidence of trauma or exacerbation of the pain at or prior to the alleged

13  onset date."  Id. (citing AR at 407).  The ALJ noted Plaintiff "did not start going to

14  rehabilitation" at CCRI for her lower back pain "until September 2010," and that she did

15  not go to CCRI at all between December 2011 and August 2012.  Id. at 38-39.  After

16  summarizing Plaintiff's treatment at CCRI, the ALJ concluded:  "While the claimant has

17  complained that her pain level appears to be increasing with constant pain, the objective

18  findings have not changed.  The claimant's condition does not show pertinent

19  deterioration or any additional medical difficulties."  Id. at 39.

20         Another reason the ALJ found Plaintiff's claim not fully credible was that Plaintiff

21  did not begin physical therapy for lower back pain until August 14, 2012, more than

22  three years after the AOD.  Id. (discussing AR at 542-61).  In addition, the ALJ, after

23  summarizing Plaintiff's treatment notes, concluded physical therapy was "generally

24  effective at easing the claimant's pain and improving her capacities."  Id.  The ALJ

25  noted, for example, that Plaintiff began to see significant improvement after only a

26  couple of weeks of physical therapy.  Id.

27         Another reason the ALJ found Plaintiff's claim of disability less than fully

28  credible was Plaintiff "was never seen by, or referred to, an orthopedist or a neurologist

13

1   for her back pain or reported radiculopathy." Id.  "Notably," the ALJ stated, "other than

2   going to physical therapy and a rehabilitation physician for [epidural steroid] injections,

3   the claimant has only received her treatment from a general practitioner." Id.  The ALJ

4   stated that, judging from the Administrative Record, it appeared Dr. Sharif "did not

5   perform physical examinations or diagnostic testing," but instead relied on "the

6   claimant's subjective complaints of back pain and leg pain that was allegedly getting

7   worse." Id.  The ALJ further noted Dr. Mark Ramirez's notes from June 26, 2012,

8   indicated "that physical examination of the claimant was unremarkable." Id.

9          Another reason the ALJ found Plaintiff's claim of disability less than fully

10  credible was that Plaintiff had generally received only "conservative treatment consisting

11  of pain medications, physical therapy, and epidural steroid injections." Id. at 39.

12  Moreover, the ALJ noted that, according to Plaintiff's medical record, these "treatment

13  modalities . . . have been generally successful in controlling" Plaintiff's "allegedly

14  disabling symptoms." Id. at 40.

15         Finally, the ALJ also noted the absence of a treating source statement that directly

16  addressed whether Plaintiff was disabled.  The ALJ stated:  "Notably, there is no medical

17  source statement from any treating source suggesting functional limitations from the

18  claimant's physical impairments and no statement by a physician that the claimant

19  cannot work." Id. at 41.

20

21  **E.     Step Four**

22         At step four, the ALJ found Plaintiff "is capable of performing past relevant work

23  as a cashier and a slot attendant." Id.

24

25  **F.     Step Five**

26         The ALJ did not analyze step five.

27

28

14

1

**V.**

2

**PLAINTIFF'S CLAIMS**

3      Plaintiff asserts the following claims:

4      1.      The ALJ failed to develop the record.

5      2.      The ALJ's RFC assessment is unsupported by substantial evidence.

6      3.      The ALJ's credibility determination is legally erroneous and unsupported by

7              substantial evidence.

8      4.      The ALJ's step five determination is unsupported by substantial evidence.[3]

9 ECF No. 18 at 1.

10

11

**VI.**

12

**STANDARD OF REVIEW**

13      Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's

14 decision to deny benefits.  This Court "may set aside a denial of benefits if it is not

15 supported by substantial evidence or it is based on legal error."  Pinto v. Massanari, 249

16 F.3d 840, 844 (9th Cir. 2001) (citation and internal quotation marks omitted).

17      "Substantial evidence" is evidence a reasonable person might accept as adequate

18 to support a conclusion.  Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It

19 is more than a scintilla but less than a preponderance.  Id.  To determine whether

20 substantial evidence supports a finding, the reviewing court "must review the

21 administrative record as a whole, weighing both the evidence that supports and the

22 evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157

23 F.3d 715, 720 (9th Cir. 1998); see also Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir.

24 2012) (stating that a reviewing court "may not affirm simply by isolating a specific

25 quantum of supporting evidence") (citations and internal quotation marks omitted).  "If

26

27      [3] The ALJ did not make a step five determination.  Thus, the Court assumes Plaintiff

28 actually wishes to challenge the ALJ's step four determination.

15

1    the evidence can reasonably support either affirming or reversing," the reviewing court

2    "may not substitute its judgment" for that of the Commissioner.  Reddick, 157 F.3d at

3    720-21; see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the

4    evidence is susceptible to more than one rational interpretation, we must uphold the

5    ALJ's findings if they are supported by inferences reasonably drawn from the record.").

6        The Court may review only the reasons stated by the ALJ in his decision "and may

7    not affirm the ALJ on a ground upon which he did not rely."  Orn v. Astrue, 495 F.3d

8    625, 630 (9th Cir. 2007).  If the ALJ erred, the error may only be considered harmless if

9    it is "clear from the record" that the error was "inconsequential to the ultimate

10   nondisability determination."  Robbins, 466 F.3d at 885 (citation and internal quotation

11   marks omitted).

12

13                                    **VII.**

14                               **DISCUSSION**

15   **A.    The ALJ Did Not Have a Duty to Request Additional Information from**

16          **Plaintiff's Treating Sources.**

17          **1.    Background**

18        Plaintiff argues the "ALJ erred by failing to contact Ms. Quiroz's treating health

19   providers for treating source opinions."  ECF No. 18 at 10.  Plaintiff suggests the ALJ

20   was required to request such opinions because Plaintiff's counsel "informed the ALJ at

21   the hearing that the treating sources would not fill out the requested medical source

22   statements."  Id. at 11 (citing AR at 65); see also id. at 12 ("The ALJ should have

23   developed the record to fully understand Ms. Quiroz's limitations and erred in not

24   requesting or issuing a subpoena for such opinion evidence, especially given the fact that

25   he was informed of Ms. Quiroz's attorney's requests to the physicians to get said opinion

26   evidence directly.").

27        Plaintiff specifically faults the ALJ for failing to request opinions from Dr. Sharif,

28   Dr. Balbas, and MFI.  Id. at 11-12.  Plaintiff does not articulate how the records that

                                        16

were already before the ALJ from Dr. Balbas and MFI were inadequate.  However, Plaintiff argues that, because the ALJ failed to request a treating physician opinion from Dr. Sharif, the ALJ improperly concluded Dr. Sharif's "'reports fail to reveal significant clinical and laboratory abnormalities that would be expected for a more incapacitated individual.'"  Id. at 11 (quoting AR at 29).  Plaintiff argues:  "Dr. Sharif must have believed Ms. Quiroz experienced limitations from her physical impairments which is evident given the types of medications he prescribed to relieve her symptoms."  Id.  As the Court understands it, Plaintiff argues (1) the ALJ assumed, based on an inadequate record, Dr. Sharif did not believe Plaintiff "experienced limitations"; and (2) based on this incorrect assumption, the ALJ concluded Dr. Sharif's records "fail to reveal" evidence of incapacitation.

### 2.     Legal Standard

"The ALJ always has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."  Celaya v. Halter, 332 F.3d 1177, 1183 (9th Cir. 2003) (citation and internal quotation marks omitted).  "[I]t is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  Id. (citation and internal quotation marks omitted).

"[A]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2010) (footnote and internal quotation marks omitted); see also Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002) ("[T]he requirement for additional information is triggered only when the evidence from the treating medical source is inadequate to make a determination as to the claimant's disability.").  "The ALJ may discharge this duty in several ways, including subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record."  Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir.

17

1    2001) (citations omitted).

2

3        **3.    Application**

4        Plaintiff argues that the ALJ, in concluding Dr. Sharif's records "fail to reveal"

5    evidence of incapacitation, improperly assumed, based on an inadequate record, Dr.

6    Sharif did not believe Plaintiff "experienced limitations."  ECF No. 18 at 11.  This

7    argument is meritless.  First, "[i]t appears from the record that substantially all of [Dr.

8    Sharif's] medical records throughout the time [he] treated [Plaintiff] were before the

9    ALJ."  McLeod, 640 F.3d at 884.  Plaintiff has not demonstrated there was anything

10   "unclear or ambiguous" about those records.  Id.  Thus, "[t]he ALJ had no duty to

11   request more information from" Dr. Sharif.  Id.

12       Second, the ALJ's conclusion regarding Dr. Sharif's records does not demonstrate

13   the ALJ assumed *anything* about Dr. Sharif's beliefs.  A doctor's belief that a claimant

14   experiences limitations does not preclude an ALJ from finding that the doctor's records

15   do not reveal evidence of incapacitation.  On the contrary, ALJs frequently find that a

16   limitation does not constitute a disability.  See, e.g., Verduzco v. Apfel, 188 F.3d 1087,

17   1089 (9th Cir. 1999) ("Although [he] clearly does suffer from diabetes, high blood

18   pressure, and arthritis, there is no evidence to support his claim that those impairments

19   are 'severe.'"); Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere

20   existence of an impairment is insufficient proof of a disability.") (citation omitted).

21       Similarly unavailing is Plaintiff's argument that the ALJ had a duty to request

22   medical source statements from Dr. Sharif, Dr. Balbas, and MFI simply because those

23   practitioners allegedly refused to provide such statements to Plaintiff.  Plaintiff does not

24   cite any authority, and the Court is not aware of any, requiring an ALJ to request a

25   source statement whenever a plaintiff cannot obtain one.  As previously stated, "an

26   ALJ's duty to develop the record further is triggered *only* when there is ambiguous

27   evidence or when the record is inadequate to allow for proper evaluation of the

28   evidence."  McLeod, 640 F.3d at 885 (emphasis added).  Plaintiff has failed to

                                              18

1   demonstrate the evidence before the ALJ was ambiguous or inadequate.  Thus, the ALJ

2   was not required to request additional statements from Plaintiff's treating sources.

3

4   **B.    The ALJ's RFC Assessment and Step Four Determination Were Supported**

5          **by Substantial Evidence.**

6          **1.    Background**

7          Plaintiff argues the ALJ's RFC assessment was not supported by substantial

8   evidence.  Specifically, Plaintiff challenges the ALJ's determination that Plaintiff can

9   "'occasionally bend.'"  ECF No. 18 at 13 (quoting AR at 36).  According to Plaintiff's

10  motion for summary judgment:  "Although [Plaintiff's] pain is managed from time to

11  time, [she] still exhibits an inability to bend over and this limitation is substantiated by

12  the objective medical evidence, namely by Dr. Balbas and Ms. Oltman's medical

13  observations and notes."  Id. at 14.  Plaintiff argues "the ALJ erred in finding that Ms.

14  Quiroz can occasionally bend and this matter requires remand for a proper RFC

15  determination."  Id.

16         Plaintiff also argues the ALJ's erroneous RFC determination was not harmless.

17  According to Plaintiff, as a result of the faulty determination, the ALJ posed hypothetical

18  questions to the VE that failed "to account for all of Ms. Quiroz's limitations."  Id. at 17.

19  The ALJ then relied on the VE's responses to those "incomplete" hypothetical questions

20  to conclude, at step four, Plaintiff could perform past relevant work.  Id.  Thus, according

21  to Plaintiff, the ALJ's RFC assessment tainted his determination at step four.

22

23         **2.    Discussion**

24         The ALJ's finding that Plaintiff can occasionally bend was supported by

25  substantial evidence.  Contrary to Plaintiff's contention, Dr. Balbas's and Ms. Oltman's

26  notes did not contradict the ALJ's finding.  Neither practitioner's notes state Plaintiff

27  cannot bend; to the contrary, they both affirmatively state Plaintiff can bend, albeit not as

28  much as someone who is unimpaired.  Dr. Balbas's report stated that, as of December 15,

1    2011, Plaintiff's range of lumbar flexion was limited to 30 degrees.  AR at 516.  Ms.

2    Oltman's report stated that, as of September 14, 2012, Plaintiff's range of lumbar flexion

3    was between 20 and 39 degrees – with the ideal range being greater than 50 degrees.  Id.

4    at 545.  The ALJ took these findings into account, noting at step two that Plaintiff's

5    lumbar "range of motion" is limited.  AR at 33.  Thus, contrary to Plaintiff's contention,

6    Dr. Balbas's and Ms. Oltman's reports did not contradict the ALJ's conclusion that

7    Plaintiff can occasionally bend.

8          Because the ALJ's RFC assessment was not erroneous, his hypothetical questions

9    to the VE did not, as Plaintiff contends, "fail[] to account for all of Ms. Quiroz's

10   limitations."[4]  ECF No. 18 at 17.  In the alternative, assuming *arguendo* the ALJ's

11   finding that Plaintiff can occasionally bend is erroneous, the finding was harmless

12   because Plaintiff's past relevant jobs as a cashier and slot attendant do not require

13   bending.  See DOT §§ 211.462-018, 342.667-912.

14

15   **C.**    **The ALJ's Credibility Determination Was Neither Legally Erroneous Nor**

16        **Unsupported by Substantial Evidence.**

17       **1.**    **Background**

18        Plaintiff challenges the ALJ's determination that the "'claimant's subjective

19

20      [4] The Court notes Plaintiff's hearing attorney did not object to the ALJ's numerous

21   questions to the VE about hypothetical individuals who could "occasionally bend."  See

22   AR at 83-89.  Nor did Plaintiff's hearing attorney ask the VE about a hypothetical

23   individual who could not bend.  See id.  In response to questioning by the ALJ and

24   Plaintiff's hearing attorney, the VE answered questions about nine hypothetical

     individuals with different combinations of impairments; not *one* of those nine

25   hypothetical individuals was unable to bend.  There is no evidence or suggestion that

26   Plaintiff's counsel was unable to ask additional questions of the VE.  See Solorzano v.

     Astrue, No. 5:11-cv-369-PJW, 2012 WL 84527, at *6 (C.D. Cal. 2012) ("Counsel are not

27   supposed to be potted plants at administrative hearings.  They have an obligation to take

     an active role and to raise issues that may impact the ALJ's decision while the hearing is

28   proceeding so that they can be addressed.").

1  complaints are less than fully credible and the objective medical evidence does not

2  support the alleged severity of symptoms.'"  ECF No. 18 at 14 (quoting AR at 41).

3  Plaintiff argues this determination "is legally erroneous and unsupported by substantial

4  evidence."  Id.  Plaintiff's motion for summary judgment argues she "should have been

5  found credible," given "the frequency of her symptoms, persistence in seeking medical

6  attention to absolve her pain and limitations, [and] corroboration by her testimonial and

7  medical records."  Id. at 16.

8

9           **2.      Legal Standard**

10         "In assessing the credibility of a claimant's testimony regarding subjective pain or

11  the intensity of symptoms, the ALJ engages in a two-step analysis."  Molina, 674 F.3d at

12  1112 (citation omitted).  "First, the ALJ must determine whether there is objective

13  medical evidence of an underlying impairment which could reasonably be expected to

14  produce the pain or other symptoms alleged."  Id. (citations and internal quotation marks

15  omitted).  "If the claimant has presented such evidence, and there is no evidence of

16  malingering, then the ALJ must give specific, clear, and convincing reasons in order to

17  reject the claimant's testimony about the severity of the symptoms."  Id. (citations and

18  internal quotation marks omitted).  "At the same time, the ALJ is not required to believe

19  every allegation of disabling pain, or else disability benefits would be available for the

20  asking . . . ."  Id. (citations and internal quotation marks omitted).

21         "In evaluating the claimant's testimony, the ALJ may use ordinary techniques of

22  credibility evaluation."  Id. (citations and internal quotation marks omitted).  "For

23  instance, the ALJ may consider inconsistencies either in the claimant's testimony or

24  between the testimony and the claimant's conduct; unexplained or inadequately

25  explained failure to seek treatment or to follow a prescribed course of treatment; and

26  whether the claimant engages in daily activities consistent with the alleged symptoms

27  . . . ."  Id. (citations and internal quotation marks omitted).  "While a claimant need not

28  vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a

1    claimant's testimony when the claimant reports participation in everyday activities

2    indicating capacities that are transferable to a work setting . . . ." Id. (citations and

3    internal quotation marks omitted).  "Even where those activities suggest some difficulty

4    functioning, they may be grounds for discrediting the claimant's testimony to the extent

5    that they contradict claims of a totally debilitating impairment." Id. (citations and

6    internal quotation marks omitted).

7         "When evidence reasonably supports either confirming or reversing the ALJ's

8    decision, we may not substitute our judgment for that of the ALJ." Ghanim v. Colvin,

9    763 F.3d 1154, 1164 (9th Cir. 2014) (citation and internal quotation marks omitted).

10   Even if "the ALJ erred in relying on one of several reasons in support of an adverse

11   credibility determination," the error is considered harmless if "the ALJ's remaining

12   reasoning and ultimate credibility determination were adequately supported by

13   substantial evidence in the record." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d

14   1155, 1162 (9th Cir. 2008) (citation and emphasis omitted).  "So long as there remains

15   substantial evidence supporting the ALJ's conclusions on credibility and the error does

16   not negate the validity of the ALJ's ultimate credibility conclusion, such is deemed

17   harmless and does not warrant reversal." Id. (citations, internal quotation marks, and

18   alterations omitted); see also id. at 1163 ("Here, the ALJ's decision finding [the

19   claimant] less than fully credible is valid, despite the [ALJ's] errors . . . .").

20

21        **3.    Application**

22        The ALJ gave "specific, clear, and convincing reasons" for rejecting Plaintiff's

23   claim that she cannot work. Molina, 674 F.3d at 1112.  After an extensive review of the

24   record, the ALJ concluded Plaintiff's claim of total disability beginning in March 2009

25   was an exaggeration. See AR at 37-41.  In support of this finding, the ALJ cited, *inter*

26   *alia*, Plaintiff's daily activities; Plaintiff's failure to go to CCRI for rehabilitation until

27   September 2010; Plaintiff's failure to begin physical therapy until August 2012; the

28   absence of evidence that Plaintiff's back condition worsened before she quit working in

1  March of 2009; Plaintiff's reliance primarily on general practitioners for treatment;

2  Plaintiff's positive response to relatively conservative treatment;[5] and the absence of any

3  medical opinion – from either a treating or examining source – that Plaintiff is unable to

4  work.  See supra Section VI.D.  Each of these considerations was valid.  See, e.g.,

5  Molina, 674 F.3d at 1112 (stating a claimant's "everyday activities" and "failure to seek

6  treatment" may "contradict claims of a totally debilitating impairment"); Magallanes v.

7  Bowen, 881 F.2d 747, 755 (9th Cir. 1989) (upholding ALJ's determination that Plaintiff

8  did not have a disabling back impairment before a particular date, where the ALJ

9  "pointed out the absence of objective medical findings or evidence of" impairment prior

10  to that date); Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) ("[T]he ALJ properly

11  considered [claimant's doctor's] failure to prescribe, and [claimant's] failure to request,

12  any serious medical treatment for [claimant's] supposedly excruciating pain.") (citation

13  omitted); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999)

14  ("[C]ontrary to [the claimant's] claims of lack of improvement, [his doctor] reported that

15  [his] mental symptoms improved with the use of medication."); Verduzco, 188 F.3d at

16  1089 ("None of the [claimant's] treating or examining physicians ever indicated that [he]

17  was disabled.").

18        Plaintiff challenges the ALJ's credibility determination, citing "the frequency of

19  her symptoms, persistence in seeking medical attention to absolve her pain and

20  limitations," and the "corroboration by her testimonial and medical records."  ECF No.

21  18 at 16.  However, Plaintiff does not specifically challenge any of the ALJ's findings or

22  any of the evidence the ALJ cited.  Even assuming certain findings or certain evidence

23  the ALJ cited are invalid, his credibility determination was supported by substantial

24  evidence.  See Carmickle, 533 F.3d at 1162-63.  At most, Plaintiff has shown that the

25  _____

26  [5] The Court recognizes the ALJ erred in classifying Plaintiff's epidural steroid shots
as "conservative" treatment.  See Garrison v. Colvin, 759 F.3d 995, 1015 n.20 (9th Cir.
27  2014).  Nonetheless, the Court finds the error harmless, as the credibility determination
was supported by substantial evidence.  See Carmickle, 533 F.3d at 1162-63.
28

1  evidence "reasonably supports either confirming or reversing the ALJ's decision," in
2  which case the decision must be affirmed.  <u>Ghanim</u>, 763 F.3d at 1164.

3

4                                    **VIII.**

5                                **<u>CONCLUSION</u>**

6          IT IS THEREFORE ORDERED that judgment be entered AFFIRMING the

7  decision of the Commissioner.

8

9  DATED:  December 10, 2014

10                                        _____
                                          HON. KENLY KIYA KATO
                                          United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        24